# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **ANDREW M. SHEHEE, MARGARET S. SHEHEE, NELL SHEHEE, ANN SHANE SHEHEE, THE SHEHEE LIMITED PARTNERSHIP, THE VIRGINIA K. SHEHEE INTER VIVOS TRUST, and ANDREW M. SHEHEE, MARGARET S. SHEHEE, AND JOHN A. HENSARLING, AS CO-TRUSTEES OF THE VIRGINIA K. SHEHEE INTER VIVOS TRUST** | **CASE NO.  22-00078**<br><br>**DISTRICT JUDGE DeGRAVELLES**<br><br>**MAGISTRATE JUDGE BOURGEOIS** |
| **VS.** | |
| **LEWIS & ELLIS, INC.** | |

## STATEMENT OF UNCONTESTED MATERIAL FACTS

Defendant Lewis & Ellis, Inc. ("Defendant") respectfully submits the following Statement of Uncontested Material Facts in Support of its Motion for Summary Judgment.

1. The origin of the instant dispute involves a purchase agreement Plaintiffs entered with Security National Life Insurance Company ("Security National") on October 11, 2019, whereby Security National agreed to buy all of Plaintiffs' shares of common stock in Kilpatrick Life Insurance Company ("Kilpatrick"). R. Doc. 1-1, ¶ 3.

2. At this time, Plaintiffs owned 99.99% of all issued and outstanding shares of commons stock in Kilpatrick. R. Doc. 1-1, ¶ 3.

3. Prior to the sale, Kilpatrick had issued a certain type of life insurance policy (both Kilpatrick and Security National were in the life insurance business) that provided for increases in death benefits based on increases in the consumer price index (CPI) ("Director Series policies"). R. Doc. 1-1, ¶ 5.

4. Kilpatrick established reserves that were intended to cover the increases in death benefits payable under these policies. R. Doc. 1-1, ¶ 6.

5. After the sale of the stock, which was finalized on December 13, 2019, Security National sent a letter ("Demand Letter") to Plaintiffs alleging that Kilpatrick's reserves for "some or all" of the Director Series policies "appear to have been

calculated incorrectly and do not appear to have followed the contractual language according to Plaintiffs' past practices in paying death benefits." Doc. 1-1 ¶¶ 10-12.

6.    Security National alleged that the reserves for the Director Series policies were "deficient for the future liabilities and death benefits payable under those policies." Doc. 1-1, ¶ 12.

7.    Plaintiffs allege that Defendant was hired to make calculations and determinations regarding the amounts to be allocated to reserves for those policies. Doc. 1-1, ¶ 8.

8.    In the Petition, Plaintiffs allegation of fault against Defendant consists only of a re-statement of the substance of the Demand Letter, before asserting that Defendant "negligently and erroneously calculated the amounts that should have been allocated to Reserves each year for the [Director Series policies]." Doc. 1-1, ¶¶ 13-17.

9.    Plaintiffs were not aware of any improper calculations from Defendant until receiving the Demand Letter. Doc. 1-1, ¶ 18.

10.   Plaintiffs seek a declaratory judgment that Defendant is liable for any and all amounts for which Plaintiffs are or may be liable to Security National as a result of the alleged negligence, as well as a finding of liability for damages. Doc. 1-1, ¶¶ 19-20.

11.   Plaintiffs' only response to the interrogatory asking for the manner in which they claim Defendant negligently or otherwise improperly performed actuarial services is that incorrect reserve factors were provided and that an adjustment proposed by Defendant – but never accepted by Kilpatrick – by email on May 3, 2017, was not made. *Exhibit 1*, Plaintiffs' Objections and Responses to Defendant's First Set of Interrogatories and Requests for Production of Documents, p. 5, Answer to Interrogatory No. 2.

12.   Defendant would calculate reserve factors for each plan, age, and duration, and then send those factors to Kilpatrick to determine reserves. *Ex. 1*, Plaintiffs' Objections and Responses to Defendant's First Set of Interrogatories and Requests for Production of Documents, p. 6, Answer to Interrogatory No. 5.

13.   When asked to describe how Plaintiffs calculated the amount of damages sought from Defendant, Plaintiffs only identified a series of spreadsheets created by Security National. *Ex. 1*, Plaintiffs' Objections and Responses to Defendant's First Set of Interrogatories and Requests for Production of Documents, p. 7, Answer to Interrogatory No. 8.

14.   When asked to state any standards, codes, or regulations Plaintiffs contend were breached, Plaintiffs stated that none have been determined. *Ex. 1*, Plaintiffs'

Objections and Responses to Defendant's First Set of Interrogatories and Requests for Production of Documents, pp. 8-9, Answer to Interrogatory No. 11.

15.  John Hensarling is the only plaintiff who was involved with Kilpatrick on a day-to-day basis and knows the most about Kilpatrick's reserves system. *Exhibit 2*, Hensarling Dep. 19:21-20:4.

16.  The other plaintiffs' involvement was limited to sitting on the Kilpatrick Board of Directors. *Ex. 2*, Hensarling Dep. 19:21-20:4.

17.  Mr. Hensarling wrote Kilpatrick's administration system, which was responsible for, *inter alia*, calculating Kilpatrick's reserves. *Ex. 2*, Hensarling Dep. 11:10-24, 12:21-22, 31:11-16.

18.  It was Mr. Hensarling's job to tell Scott Gibson, of Lewis & Ellis, Inc., what the policy said, and Mr. Gibson would send Mr. Hensarling the reserve factors to load into the system to reserve the policies going forward. *Ex. 2*, Hensarling Dep. 17:21-25.

19.  Reserves are a highly mathematical estimate of what's going to happen in the future, and are an estimate of future claims. *Ex. 2*, Hensarling Dep. 12:15-18.

20.  Security National's $1.1 million demand to Plaintiffs, which is the sole basis for Plaintiffs' claim against Defendant, was an estimate. *Exhibit 5*, Overbaugh Dep. 71:8-12; Doc. 1-1, ¶¶ 13-18.

21.  The Statutory reserve deficiency is related to an <u>underestimation</u> of the future death benefits that would become payable from Director Series policies after the policyholder had fully paid all their contractual premiums to KLICO. *Exhibit 6,* ARM Expert Report, p. 5 (emphasis in original).

22.  Reserves are largely "judgmental" and are an "estimation." *Exhibit 11*, Chacosky Dep. 52:25-54:4, 63:24-64:3.

23.  Reserves and claims are two separate things. What the reserve was on a policy does not have anything to do with how much Kilpatrick was paying. *Ex. 2*, Hensarling Dep. 63:14-16.

24.  Any actual costs relating to policyholder claims would not be known until the claimholder passed away and the claim was paid. *Ex. 2*, Hensarling Dep. 64:1-21.

25.  There is no evidence that Plaintiffs have calculated a damage amount arising from Defendant's alleged negligence. *Ex. 2*, Hensarling Dep. 88:9-90:1.

26.    Security National cannot say how much of its demand to Plaintiffs was attributed to Kilpatrick's failure to pay death benefits and how much arose from Lewis & Ellis's reserve calculations. *Exhibit 3*, Moore Dep. 98:3-25.

27.    Security National's $1.1 million demand to Defendant came entirely from Mackay Moore's calculations. *Ex. 5*, Overbaugh Dep. 49:8-15.

28.    Mr. Moore cannot state what caused the alleged deficiency at issue because he has never had access to Defendant's calculations. *Ex. 3*, Moore Dep. 33:11-17, 99:1-6.

29.    Mr. Moore's only basis for understanding the actuarial calculations prepared by Defendant was a spreadsheet prepared by Scott Gibson *after* Mr. Gibson received and reviewed the Demand Letter and in which Mr. Gibson brainstorms potential explanations for how Security National may have calculated its demand figure. This spreadsheet is a list of mere possibilities, is **not** Lewis & Ellis's actual calculation of Kilpatrick's reserves, and does not necessarily portray the calculation of Kilpatrick's reserves in an accurate manner. *Ex. 3*, Moore Dep. 99:7-15, 100:12-23; *Exhibit 4*, Scott Gibson Affidavit, ¶ 5.

30.    Security National never requested a review of Defendant's reserve calculations. *Ex. 3*, Moore Dep. 105:14-20.

31.    Plaintiffs' expert did not determine the amount of the alleged reserve deficiency. *Ex. 6*, ARM Expert Report, pp. 3, 5.

32.    Reserves constitute liabilities. *Ex. 2*, Hensarling Dep. 12:7-20.

33.    The more reserves a company will have, the less the company will be worth. *Ex. 2*, Hensarling Dep. 12:7-20.

34.    Any artificially low reserves caused by Defendant would have resulted in an overpayment collected by Plaintiffs at the time Kilpatrick was sold to Security National. *Commercial Insurance - Reserves*, Insurance Information Institute, June 6, 2023, at 1, https://www.iii.org/publications/commercial-insurance/how-it-functions/financial-reporting.

35.    If there should have been $1.1 million more in reserves on Kilpatrick's books at the time of the sale, as Plaintiffs allege, then the value of Kilpatrick would have been $1.1 million less. *Ex. 2*, Hensarling Dep. 112:12-17; *Exhibit 7*, Charlie R. Allison Expert Report, p. 5.

36.    Plaintiffs and Security National negotiated a "compromise" whereby a promissory note from Rose-Neath in the amount of $1,005,507.56 was issued to Kilpatrick Life Insurance Company in exchange for Security National promising not to

pursue litigation against Plaintiffs. *Ex. 2*, Hensarling Dep. 140:2-142:5; *Ex. 5,* Overbaugh Dep. 88:24-89:6, 90:22-25.

37.    Adjustments and settlements made between Plaintiffs and Security National are part of the Stock Purchase agreement and adjustments provided for therein. *Ex. 7*, Charlie R. Allison Expert Report, p. 5.

38.    The Mx/Dx commutation factors were supplied to Kilpatrick in 1990, approximately five years prior to the issuance of the Director Series line of policies, for general use in calculating paid-up reserves. *Ex. 2*, Hensarling Dep. 32:17-24, 73:19-22.

39.    Mr. Hensarling expected the Director Series reserves to be accounted for through a manual adjustment rather than the Mx/Dx commutation factors. *Ex. 2*, Hensarling Dep. 131:1-10.

40.    Mr. Hensarling never told Lewis & Ellis to make a manual adjustment to Director Series reserves. *Ex. 2*, Hensarling Dep. 44:16-45:2, 91:6-15, 103:7-18.

41.    Defendant's method of accounting for the Director Series CPI component was to apply Actuarial Guideline 25 ("AG 25"), a completely appropriate method of reserving for CPI-dependent products. *Ex. 2*, Hensarling Dep. 125:6-22; *Ex. 8*, Gibson Dep. 142:15-143:18; *Exhibit 9*, Jiang Dep. 33:6-16; *Ex. 7*, Charlie R. Allison Expert Report, p. 9.

42.    The email from Lisa Jiang to John Hensarling dated July 5, 2016, stated, "Please find attached the revised reserve factors for the Directors' series… per Actuarial Guideline 25. As Scott mentioned before, with these new reserve factors, we should expect a decrease in the overall reserves," before explaining exactly how AG 25 worked. *Ex. 2*, Hensarling Dep. 122:4, *Exhibit 10*, Exhibit 3 to Deposition of John Hensarling, p. 18.

43.    Mr. Hensarling did not look at the death benefit column of the factors, did not understand the ramifications of the July 5, 2016, email and should have checked it further, and admits that "if you read that e-mail" it conveys that Defendant was applying AG 25 to Kilpatrick's policies. *Ex. 2*, Hensarling Dep. 125:23-126-4, 130:15-132:14.

44.    Defendant informed Mr. Hensarling that it applied AG 25 to the future benefit calculations of the Director Series factors but Mr. Hensarling did not pay attention to it. *Ex. 2*, Hensarling Dep. 122:4-126:4.

45.    AG 25 is appropriate for reserving any product that integrates the CPI, the language of the Director Series product integrated the CPI, and by applying AG 25 Defendant was "going by the book." *Ex.* 2, Hensarling Dep. 128:22-129:4,

127:20-24; *Ex. 8*, Gibson Dep. 39:9-15, 142:15-143:18; *Ex. 9*, Jiang Dep. 33:6-16; *Ex. 7*, Charlie R. Allison Expert Report, p. 9.

46.     The reserves and claims are two separate things. What the reserve was on a policy did not have anything to do with how much Kilpatrick was paying. *Ex. 2*, Hensarling Dep. 63:14-16.

47.     Appropriate reserving and administration of [Director Series] products require adherence to AG 25 as a minimum reserve standard. Actuarial Guideline 25 is the appropriate basis for reserves under the Director Series. First and foremost, the administrative system must update for increases in death benefits that have already occurred. The death benefits must be up to date. Reserve calculations must recognize potential future death benefit increases as per the AG 25 method. *Ex. 7*, Charlie R. Allison Expert Report, p. 10.

48.     The year-to-year increase in actual death benefits for the Director Series policies was determined annually by Kilpatrick – and was up to Kilpatrick's discretion. *Ex. 8*, Gibson Dep. 123:1-13.

49.     There was no predefined increase in how the death benefits were going to go on the Directors Series policies. They were tied to the CPI as a floor and Kilpatrick had the latitude to declare whatever increase it wanted. *Ex. 8*, Gibson Dep. 123:2-6.

50.     Defendant did not know what increase in actual death benefits for Director Series policies Kilpatrick would choose. *Ex. 8*, Gibson Dep. 123:1-17.

51.     When Kilpatrick determined its increase in actual death benefits for Director Series policies, it was tasked with changing the face amount on its records to correspond to what the new death benefit was. *Ex. 8*, Gibson Dep. 123:14-17; *Ex. 10*, Exhibit 3 to Deposition of John Hensarling, p. 18.

52.     Defendant made Kilpatrick aware of the use of AG 25 in 2015 or 2016, at least three years prior to the sale to Security National. *Ex. 2*, Hensarling Dep. 99:18-100:4.

53.     Defendant communicated usage of AG 25 for Director Series reserves to Mr. Hensarling but Mr. Hensarling did not take the time to understand it. *Ex. 2*, Hensarling Dep. 108:17-24, 127:16-17, 137:17-138:12.

54.     Mr. Hensarling communicated to Defendant that Kilpatrick approved of the use of AG 25 in calculating reserves. *Ex. 2*, Hensarling Dep. 80:9-14.

*(signature block on following page)*

Respectfully submitted,


**THOMPSON, COE, COUSINS & IRONS, LLP**

*/s/ Martin Schneider* _____

**CHRISTOPHER W. KAUL (33213), T.A.**
**MARTIN SCHNEIDER (40122)**
601 Poydras Street, Suite 1850
New Orleans, Louisiana  70130
Telephone:      (504) 526-4350
Facsimile:      (504) 526-4310
E-mail:           ckaul@thompsoncoe.com
                      mschneider@thompsoncoe.com

**COUNSEL FOR LEWIS & ELLIS, INC.**




**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that to the best of my knowledge all counsel of record consent to and participate in receiving electronic notification from the CM/ECF system, and that the Clerk of the Court for the Middle District of Louisiana, using the CM/ECF system, will electronically send notification of the filing of this pleading to all counsel of record.


By:   */s/ Martin Schneider*_____
        Martin Schneider